Good morning, Judge Callahan, and may it please the court. My name, again, is Jim Saywell, and I'm here today representing the defendants Nationwide Biweekly and Dan Lipsky, the business, the small business owner. I, there's a lot of disagreement in this case. I would like to start, though, with where the parties agree. The parties agree that when the CFPB initiated this action in 2015 against my clients, the CFPB was unconstitutionally structured. And without correction, that action must be set aside. It was defective and ultra-virus. Now, the CFPB rests its hopes on the idea of a five-year after-the-fact ratification, being able to transform this action from a defective ultra-virus one into a perfectly legitimate one. This court should not let the CFPB off so easily. Mr. Saywell, can I jump to something that's been bothering me? There's another case, right, the Sela Law case that is on remand. And they do have, obviously, the ratification issue. That was why it was remanded. And so I guess the question I've got, and I think that that case has precedence over our case under our rules because it was remanded. So what is your position on the issues, aside from the merits issues that I'm sure you'll talk about later, but on this remand issue or the standing issue, what is your position as far as is this case distinguishable from the Sela Law case or not, in the sense of, like, we just need to go with what the Sela Law panel prefers? So, Your Honor, you're correct that Sela Law will control a lot of my argument. But it is not all of my argument. There are two specific ways that I think this case is distinguishable from Sela Law, however Sela Law comes out. Now, of course, if we win in Sela Law, if my side wins in Sela Law, then these two issues don't matter. But if my position loses in Sela Law, there are still two ways this court can rule in my favor. The first is Article III standing. And that is because in Sela Law, there has not yet been an enforcement action. So there is not yet in front of you an executive, or I should say, an entity that purports to have the executive power, but in fact lacked it when it brought suit. So I can, of course, talk about the Article III issues, but I'll get to the second difference. The second difference is on prong two of NRA political victory fund. And this is a fundamental one. There's really no way around this ratification being invalid because it came too late in the day. Now, that is factually debated in Sela Law. But again, the important thing is in Sela Law, there has not yet been an enforcement action. So the statute of limitations issue, and the reason this came too late in the day to be effective, is because this case was brought five years ago, and it's under a three-year date of discovery statute of limitations. So that is long since gone. What was the basis for the Sela Law case? I guess I didn't look at that as close. So I understand what the basis of this case is, because it's an enforcement action. How did that case become a case? Did Sela Law itself sue? Sela Law refused to comply with a civil investigative demand, and then because of the fail, the Sela Law just said, we're not going to do anything with you. And instead of bringing an enforcement action, the CFPB brought an action to essentially a subpoena to get those documents from Sela Law. I see your point that these are different situations, but if your argument is that CFPB didn't have standing when they initially brought the enforcement action against your client, wouldn't that be the same argument essentially for CFPB didn't have standing to bring an action to enforce a subpoena, essentially a subpoena? Well, standing is not being disputed. Of course, the Sela Law panel has the duty to consider it sua sponte, but I do think the standing inquiry is different when there is an entity trying to subpoena documents, as opposed to an entity trying to seek $80 million against a private individual and to punish that private individual. I do think that the standing inquiry is different in those two contexts. Well, let me just, I guess I'm having the same concern, not that, okay, there's a certain way Sela Law could be decided. If the ratification doesn't work there, then you win, right? Of course. Yeah. So, but if we were to decide here that there is an Article III standing and not really deal with the ratification issue, and then Sela Law comes out differently on the ratification issue, aren't we going to have, you know, as much as we all like to decide cases the way that we want to, that other panel does have precedence by our rule, and we're bound by that. So, it kind of makes sense to me because the two have some crossover to wait to see what that panel does, and then we've got a clear path to distinguish ourselves and not to have, you know, potentially an interest circuit split, and then we have to go on bonk or they'll call us on bonk because they'll say we didn't follow our own precedent. Yeah. And of course, I defer to the court's rules on which panel comes first. I get all that. Well, they have precedent because they were a remand. Otherwise, we would have precedent because we're arguing before they are, but they're not. They already started before us. So, we already... That's that. No. And so, taking... So, I think knowing that now, it does make sense to, you know, you're going to have to But I do. I mean, and maybe there will be something there. Maybe there could be supplemental briefing, but I do think that it's distinguishable in the two ways that I said. The Article III, the jurisdictional question is different in the context of an enforcement action. And then prong two is different. Prong two of NRA Political Victory Fund. I really think NRA Political Victory Fund controls this case, and it doesn't control in seal law. This is... Let's make sure that it wouldn't control depending upon how seal law decided the ratification question. But if seal law just said, and I suppose you could argue it was dicta, but we have some interesting rules about some dicta being binding on panels. And so, if seal law said, it's a disputed issue in our case about whether the statute of limitations would have run by the time that we were in a position to actually have authority to do what we did. But we don't care about that disputed issue, because regardless, regardless of which way you came down on that, ratification is good enough. So let's say they reached that conclusion. Ratification is good enough, and it doesn't matter whether or not you've got this NRA Political Victory argument you're making. Wouldn't that be, I mean, I think that would foreclose your NRA Political Victory argument. Well, of course, I would have to read what seal law says. I seal law, no more than this panel, no more than any lower court has the ability to overrule Supreme Court precedent. So it can't just say, oh, a ratification necessarily relates back no matter how late in the day it came. That would be overruling NRA Political Victory Fund. But assuming that seal law says something like NRA Political Victory Fund is distinguishable, I think that this case is not distinguishable from NRA Political Victory Fund. This case, the CFPB concludes in its supplemental brief, or concedes rather, that it could not have brought this action afresh in July of 2020 when the ratification came. It concedes that. So you take that concession, plus the holding of NRA Political Victory Fund, which is the ratification does not necessarily relate back, and that the ratifier has to have the ability to bring an action afresh when the person ratifies. I understand your argument on that. I guess what I'm thinking, though, is that if it all depends on how seal law comes down, but if seal law panel says this is just distinguishable, NRA Political Victory Fund is a context, then that would, I think, be binding on us, because we're not really that different than the seal law case, other than that it's not contested here, is what you're saying, on the time that the statute of limitations would have run, and maybe it is contested there. But if the seal law case just says, hey, NRA Political Victory Fund has nothing to do with this case, which I think is what CFPB is arguing. So if that's what they're arguing there, and they agree, then I don't know that your argument that we can distinguish on that ground. I'll continue to try to help you. And again, with the caveat, I would have to read and analyze seal law as the panel would. But I'll continue to try to help you. So I think that, again, that my arguments about it being a subpoena action, a CID in seal law versus an actual enforcement action can make this different. And I think the Article III, as I was saying— If we can tease that one out, that's the part— Bill, the case got a question for you. Go ahead. Yeah, so that's the part I'd like you to tease out. So say that seal law reaches Article III issues and says, because of the CID, there was Article III standing. Here, there's an enforcement action. Why would that be distinguishable for Article III analysis? So I think the entity purporting to be representing the executive branch, as our argument goes, needs to be able to actually have executive power to do so, or else we're squarely within Judge Akuta's dissent in Gordon. And the analysis of the executive branch asserting a generalized interest of someone breaking the law, as they alleged here, is different in kind from an entity that purports to be the executive branch trying to get documents. When the entity purporting to be the executive branch is just trying to get documents, that's a personalized injury. They're asserting, we need these documents for some interest that is unique to us. Whereas here, the argument is really breathtakingly broad by the government, and it's that we don't need any interest personalized to us, nor do we even need to have a proper authority vested by the president under the Take Care Clause to bring this action. So I think it's just a different injury that is being asserted in the CID context compared to this one. I'm not sure if that works or not, because I'm thinking, so these are some hypotheticals I thought up for your colleague here, Mr. McCray-Warrell. So let's say I just get bored, because it turns out this job is not as exciting as I thought it was going to be. And I miss the good old days when I was in the executive branch. So just on a frolic, I decided to go out and start issuing subpoenas to people, right? And so I'm obviously not in the executive branch, and so I think there's a separation of powers problem there. But whether or not on a frolic I go out and start sending out subpoenas, or whether or not I go out and actually try to enforce some, let's just say, some consumer protection statutes. I don't know. I think in both cases, you'd say, Judge Van Dyke doesn't have standing to do that. You'd point that to some other judge, right? But I don't think I could say, well, I do have standing for the subpoenas, because some personalized injury for me. I'm just not sure that I see the distinction. In either case, if I don't have standing, I don't have standing, right? Because I'm not an actual executive. The argument is the same. I'm not an actual. So if you don't have standing, if they don't have standing, then this case would be dismissed, and that's the end of it. Is that correct? That's correct. They can't bring it again? Correct. Judge Acuda discusses this in her Gordon dissent. And actually, I listened to the Gordon oral argument, and the CFPB there conceded an argument that if there is a lack of Article 3 standing, no ratification would relate back. The case would have to be dismissed, because the district court standing, as this court knows, is determined at the time of filing, and there was no standing at that time, if our argument is right and if Judge Acuda was right. And of course, we think Gordon's majority helps us, because Gordon's majority talks about the reason they were standing there is the CFPB as an agency was at that time thought to have the executive power. Now we know it did not. Could they then, all right, could, I always get the initials wrong on this, because we have so many initials, but the CFPB, if we said there's no Article 3 standing in order to be dismissed, what could they, could they appeal that? Or do they have to get the SG's permission? Because I know there was a little bit of a dust up over that previously. They have the permission on the ratification issue, but they have permission on their Article 3 standing, or would they have to get that? I just read the statute this morning, and actually, and I believe, and of course, my friend on the other side can correct me if I'm wrong, but I believe they do have to still get approval. At least they have to ask for approval, as I understand it. And if the AG does not respond within, I think, 60 days, then they can file their petition on their own. I think that's how it works. So I want to get back to Judge Van Dyke's question. So say you don't buy my distinction. And to be honest, I, it's really hard because I have, I have, would have to read SEAL law and see what they actually say about Article 3 to distinguish it properly from the CID context versus this context. But say you don't buy that, and say you're, you think you're, you're, it's controlled the Article 3 question by SEAL law's hypothetical panel decision. So you still have my prong two argument. I think our prong one argument would be out if SEAL law goes against us. And then I don't want to sit down before mentioning, we also have a unique constitutional injury that is not existent in SEAL law. And that's our, that's really the, our second argument in our supplemental brief. And I think this case is very distinguishable from SEAL law in that way too. SEAL law, what has it been subjected to? It's been really subjected to nothing. It's been subjected to having to defend, trying to get documents. It's not given over any documents. It's certainly not reached any judgment against us. In this case, my client has been suffering from five plus years of dealing with the CFPB while the CFPB was unconstitutional. Now, Justice Thomas's concurrence, concurrence slash dissent in SEAL law, it speaks to this kind of injury and why he thinks ratification would not be proper. And we don't even need Justice Thomas's view to prevail if the SEAL law panel rejects it. We have so much more of an injury from being subjected to this five plus year action by an unconstitutional agency. So I think that's a third potential way to distinguish the hypothetical SEAL law panel opinion against us. I'm going to ask you a few questions on the merits. If, because depending on if we stayed this for SEAL law, or if we, depending on if we ever get to the merits or what, I know that it's been, there's probably raised about 15 points or something like that. Too many. With respect to the amount of penalty, did Nationwide present any evidence at trial of its diminished financial resources? So, Your Honor, just to be clear, does this go to the restitution question or does it go to the SEAL penalty? This is your penalty, the restitution question for, I'm going to give you a little extra time because we have a lot of questions for you. Thank you, Your Honor. Yes, and so I came into this case after that brief was filed and I have now caught up on all of those issues and I apologize to the court for having to go through all of them. The civil penalty argument is a statutory interpretation argument. So it doesn't, our argument is not that it turns on what evidence we presented versus what evidence the Bureau presented. Our argument is that as a matter of statutory interpretation, that it is at each day the did not occur. And the violation alleged and the few found by the district court did not occur on weekends or holidays. And so that's the statutory interpretation question. Well, no, but you're trying to claim that because there was no, that because you really can't pay this penalty, that that should have been considered. But you didn't, and you say here on appeal for the first time that you have no money to pay it. But that wasn't in front of the district court. It was never claimed in the district court from what I can say, see that nationwide said they couldn't, they had diminished financial resources. I believe, I believe that did come in. I can't, I did read the trial transcript entirely over the, over this past weekend, but I can't say I remember an exact place that came in, but I think it came in. If I, if I had to say, I think it came in, in the post trial briefing and perhaps in some exhibits to the post trial briefing, but I can't say it came in at trial. Okay. And then I'm going to ask you a restitution question. CFPB's restitution argument, with respect to their argument, did nationwide present any evidence demonstrating that CFPB's proposed gross revenue figures overstated nationwide's gains from the allegedly deceptive conduct at issue? This question, your honor, this question, your honor, I apologize is a really fundamental one and it goes to the heart of the restitution issue. The answer is that we, it was not our burden to do so. And here's why on step one of this burden shifting framework, the CFPB had the burden to reasonably approximate that unjust gains caused by the violation. Now the violation that it tied restitution. I guess your answer is, no, you didn't put anything in, but no, you don't have to. I'm sorry, your honor. I'll answer your question directly. The answer is that what the CFPB put forward did the 73 some odd million dollars in our, in our revenue, not our profits, but our revenue is, was the revenue from the setup fee. So that is, there was nothing to dispute there. That was the revenue. But then the important part of that is that revenue did not reasonably approximate the unjust gains, like not even close. The reason was that was tied exclusively to the setup fee. And you can see that all throughout the closing argument in particular, where the judge is really struggling with the restitution issue, specifically transcript 1234. It speaks directly to that. The CFPB said this concerns only the setup fee. Well, the judge found no violation for the setup fee. And so that, that really undercut and the CPP said it was all or nothing. So you add those two things together and you meet and you get no restitution, even though 73 million was the revenue that, that was from the setup fee. That was an accurate number. And if I could just say one final thing on this, it's the CFPB, of course, cannot just come into court seeking the entire revenue, unless it establishes a relevant violation and establishes resulting harm from that violation. The CFPB failed its burden to do so. Well, all right. I just want to make sure that my colleagues don't have, while we're in this part of it, because we're going over and I'll give you a rebuttal time. Do either judges Van Dyke or judge Bumate want to ask him any additional questions now? I had one question on the merits, on the liability question. The district court filed liability for the disclaimers regarding alternative programs. But one thing that was unclear to me, is there any record that shows that the other lenders that will offer the biweekly program do require a setup through a third party administrator? Because that's what I believe the disclaimer said. And the district court didn't make any, I didn't see any findings on that issue. I take the district court's resolution of that issue to be, the CFPB failed in its burden to show violations as to all customers, because only a few of these many lenders actually had a program through themselves, and the rest of them require them through third parties like Nationwide. Okay, so you are agreeing that there are, that some of the programs do offer that biweekly program through themselves rather than a third party? That's what the district court found, that a few did. I think that in fact, at trial there were two that were discussed, two of hundreds of lenders. And that's why the district court said this violation is not even close to established as to all of Nationwide's customers, not even close. Okay. Judge Kelland, can I ask one? Sure, go ahead. Quick follow-up question. So at the very end of when you were talking about ways you can distinguish yourself from see the law, you gave something that is, I think, a big, that distinguishes you, which is that, you know, huge injury here, not even clear there's any injury, but I'm having trouble understanding how, I mean, if the point is that the government, I, CFPB didn't have standing, how does your significant injury, if we stipulate that, somehow change whether the government has standing or not? It doesn't, your honor, that's a separate, that's a separate argument. I'm at this point stipulating that the seal law panel or this panel holds that there's article three standing. And now we move on to argument number two in my, in the supplemental brief, which is the constitutional injury that was, that we suffered from the unconstitutional agency taking action, reaching judgment for five plus years against us. That even, you know, even with the article three standing by the government demands a remedy. You cannot have that. The fifth circuit Collins opinion really discusses this idea. Judges Willett and Ho and Oldham discuss this idea. You cannot have such a great injury without granting a remedy. And so this is, this has nothing to do with standing. This is a separate argument. Would you want us to hold for that, that case? I think that's, was cert granted in Collins? Cert was granted in Collins. We did suggest that the court could consider holding the fifth circuit. I think extremely notable on this point, the fifth circuit on bonk has one of these exact same CFPB cases in front of it on bonk and it held for Collins. So that is another option that we've suggested. The government says don't do that because Collins doesn't involve ratification, which misses our point. Our point is that there could be ways to resolve this, especially on the injury question that make ratification irrelevant. If we've suffered an injury that demands a remedy and that cannot be cured by ratification, which we may learn, at least we may have some dicta or something on that or a holding in Collins that can be the resolution in this case. And the fifth circuit case that was held front for Collins did involve ratification as well. And the fifth circuit still held it. Okay. Thank you. I'll give you four minutes for rebuttal. That's I'm. Thank you, your honor. All right. And I'll be similarly approach you, Mr. McRae world. Go ahead. State your appearance and proceed. Thank you. Good morning, your honors. Thomas McRae world for the CFPB. Most of my colleagues argument, various actions about standing and about statute of limitations are based on the mistaken precedent premise that the bureau as a whole was unconstitutional in the wake of the civil law decision. And that's simply not what the court's opinion says. It's also inconsistent with this court's holdings and analysis in Gordon. In sale of the court said that the only constitutional defects in the bureau's structure was the director's installation for removal and that the bureau's other provisions remain fully operative. Not that they became operative, but they remain fully operative. And in fact, your honor, if you look at the central holding statements, let me ask you a question. So I listened to you made in your brief. I'm aware of it. So this is the hypothetical I was talking about. So let's say, but a little slightly different hypothetical than I gave your colleague on the other side. Let's say I get bored. But this time, instead of like just going out and doing this on my own, I talked to my friends in Congress, right? And I'm like, I'm super bored with this job. It doesn't give me enough stuff to do. I want to do something about all of the rampant consumer protection calls out there. So they go ahead and say, all right, Judge Van Dyke, in addition to being a ninth circuit judge, will now, with the help of this impressive clerks, will now go out and prosecute consumer protection things. So, I mean, I think we can all agree there's probably a serious separation of power problem there, right? Like, but they don't care. They do it anyway. The president loves it. He passed signs in the law. So I'm out there doing this. Finally, it gets up to the Supreme Court. And the Supreme Court says, no, no, no, Judge Van Dyke can't do that. He's a judge. He's got to pick, right? You're following the hypo, right? Now, when you're arguing, so it seems to me your argument would be all that stuff that I and my clerks were doing. I mean, your argument is kind of like, well, Judge Van Dyke, your argument would kind of be like, well, his clerks are, the Judge Van Dyke Chambers is doing this. Call me the, let's say that when Congress did this, they called us the, me the consumer protection czar, right? Not to confuse me with CFPB. So, but you're saying that I went out there and I do all this stuff for several years before it finally gets to the Supreme Court. Supreme Court says, can't have that. And then, but after that's done, let's just say the CFPB ratifies all the stuff that I did, all the stuff that I did. And your argument would be exactly the same there. It would be, well, you know, there's the, the problem was with Judge Van Dyke, because he violated separation of powers in this, but not with the CFPB czar, CFPB or the consumer protection czar office, which included all his clerks and everything. I having trouble seeing how in my hypo, which I don't see as any different, but just really, really puts the emphasis on the fact that you're trying to distinguish between the entity and its unconstitutional nature. Let me ask you just this, what in my hypo, would you say that as long as all my stuff that I did was ratified, it's fine. There's no, you know, it's all, it's all allowed to go forward. You know, all these, all these enforcement actions that I was in the middle of doing, would that be okay? Well, your honor, my, my, it may be a question to your hypothetical, but I think one, one potential weakness there is the fact that it's not clear you're acting or purporting to acts on behalf of the executive. Yeah, yeah, yeah, yeah. Because, because Congress, when they passed Congress, when they, when they enacted me as the CFPB or as the consumer protections czar, they set me up as an, as, in addition to being a judge, being an executive agency that goes out and, and because they didn't think you guys were doing a good enough job over CFPB. So they, they put me in to like, you know, do a better job. And so clearly they were giving me executive, and let's say they even put in there judge Van Dyke will act when he's, when he's got his, his consumer protection hat on, he will be a, he will be acting in executive capacity. Article two. Your honor, I don't mean to resist the hypothetical, but, but that it is a hypothetical. It's very difficult to, to, to parse here in the sense of, because you would not have It's not clear. You would have been representing the executive when you're sitting as a federal judge. Exactly. I wouldn't have been because we all think it's silly that a judge who's violating separation of powers would actually be exercising a proper executive to, you know, executive branch authority, article two authority. So that's what, that's why you're having trouble with my hypothetical. And that's exactly why I created the hypothetical, because that's the problem for you in this instance, with the ratification is yours. First of all, you've got to, you had the problem in Gordon that our court said was, you could get passed. But because of the, because the fact that it's just the head person doesn't, you know, the recess appointment problem isn't a problem, but then you have a problem with the whole agency having a, a separation of powers problem. That's exactly what would be the case in the hypothetical I'm giving is that the whole agency of the judge Van Dyke consumer protections czar would have a separation of powers problem. And I don't, I don't see how it wouldn't be the same for both, which is the actions I took. I had no authority to take. Your honor, I would disagree with the premise of your answer. And I would say that actually this would be controlled by Gordon because Gordon said the bureau did have executive authority at the time it filed its complaint in Gordon. It was in fact exercising executive authority. And I think your hypo is your hypothetical is closer to the, to the argument in judge Acuda's dissent. And so I think the concerns there, well, I, you know, I, I acknowledge them. They were in fact the, that's the kind of hypothetical that was presented in judge. So to make sure I understand her saying, gee, I can't tell if you're saying, well, yeah, your hypothetical is kind of sounds crazy, but, but because of Gordon and because of your position in this case, that in fact, my, my stuff would be able to be ratified or are you saying that it would not be able to be ratified? And if so, well, your honor, I think the critical difference there, one critical difference there is that there is a clear separation of powers issue with an article three judge purporting to exercise, uh, said there's a clear separation of powers issue. And with, uh, the way that the CFPB was organized, I don't, I mean, so is that your distinction? Okay. That's important. That's why I think my, that's why my hypothetical is brilliant because I think it actually illustrates the problem with your ratification. Are you better? But the state of the law decision also said that the bureau may continue to operate and remain fully operative. I knew you'd go there. So listen to this, let's change the hypo a little bit. Uh, let's say that, um, at the end of it, um, the Supreme court comes down and says you can't do both judge Van Dyke. Uh, and so I'm like, okay, yeah, but it's a lot more fun being an executive branch. So I talked to my friends in Congress, I retire or not even retire. I just, I just stepped down and I become full-time executive brands, consumer protection czars. And then I ratify my own actions. Okay. So, um, and that, that, that addresses the, the, the, the, what you were just talking about. I don't think it does your honor, because you still have the original violation there that is not present here, here at the director and wasn't in Gordon's view was in fact, exercising executive authority. You don't have that separation of powers issue. Um, that would have to drive the beer. My point is, is so was I, I was doing, I was doing both. I was executing, you know, there was a separation of powers problem in both cases, but you could exact, you could say that I was, I was extra. The only, but my point is, is that I think what my hypo shows is that, um, I may have been purporting to exercise executive power, but it was illegitimate executive power. I mean, that's what my hypo shows. And I don't see why that isn't just as true. And your, well, one for honor, the, the, the constitutional defect here was about an appointment clause violation, not about sort of blurring of fundamentals for a separation of powers. We didn't have the judiciary here issuing, you know, issuing subpoenas on behalf of the executive. What we had was, uh, you know, a director who was exercising executive authority. And I think that's a key difference in your hypothetical and one that is resolved in Gordon, but with the, you know, the majority's opinion, the panel said there, the bureau had executive authority and was fully authorized to exercise that power. Um, so I, if we find there's no article three standing, how many cases does that, and this would be dismissed. How many cases does that affect? Uh, your honor, I'm not sure I would have to research that. I'm sorry. I don't have a, I don't have that, that information at hand. And what, there are other cases out there that are in a similar posture, correct? You're not, this is not the only case. There are, and I'm not sure how many would be bound by such an opinion. It also depends on the rationale for not finding standing here. So, um, I, as a factual matter, I don't have the cases at hand and it would also depend on, on the justification for, for, uh, not finding. But your honor, again, Gordon also answers the standing question here. He says article two, um, appointment clause defects do not implicate this court's article three, just jurisdiction. That's a straight from page 1189 of the, of the court's opinion of this court's opinion. Um, and it also says that wouldn't that be, I mean, you could characterize my hypothetical as an appointment clause defect because I've been appointed as a judge, but under my hypothetical, I would also have been appointed as an executive branch official, right? That the, the cert protections are, let's say I was appointed in Congress, you know, and I was nominated in Congress, um, uh, approved it. And so that would be, that would also be an appointment, an appointments problem. I don't see how that distinguishes the, um, distinguishes it. Well, I think it would, your honor. And for one, it would, the, the, the blurring of the lines there would be difficult for as a practical matter. One, it wouldn't be clear that the president could remove, remove you as an article three  Um, and that's one of the, I mean, that would be one of the issues. Again, this, this hypothetical aspects that really aren't analogous to the situation here, where we didn't have that kind of fundamental, uh, the hypothetical you're suggesting is a really fundamental violation of separation of powers. That's why I use hypothetical because I think we understand that if it was a fundamental violation of separation of power, then that would seem to really undercut the ability to be able to, um, to have, for you to have had stay or for me and my hypothetical have standing. But this, this is no less a fundamental, it just may not have been as obvious until the Supreme court rule, right? I'm using the obvious example of me in order to show that in an obvious example, our intuition seems to be, no, me wearing my executive hat wouldn't have standing, but it's no less fundamental. The Supreme court, I mean, there's language and see the law that says it's a fundamental violation of separation of power. Well, you're right. I think that comes from a one in sailor law that comes from looking back historically at the kinds of agencies, the language you may be referring to is, you know, such an agency has no place for constitutional structure. The court was looking historically there, but I would like to respond. There are other cases. One, I think say a lot does establish Vermont. There's no historical example of, of my crazy hypo either. Right. I mean, I don't see how that distinguishes it. Well, you know, one case I would like to refer to your honor is the Vermont extra, uh, you know, uh, Vermont natural resources case where there was the court acknowledged. We have, we have to address standing there because there was a, you know, there was a fundamental standing issue that had to be addressed there. And the court said, look, there is an article to appointment clause defect here lurking in the background. But it said, we're not going to, we're not going to address that because it doesn't implicate our standing because standing flows from article three. Can I see if this is, maybe this is a distinction. I mean, the one distinction I can think between my hypo and, and your circumstance is that in my hypo, you know, it's just me and my quotes, right. You know, it's really, which is just me. Right. And so if I don't have authority, then kind of the whole agency of this, of the concern protections are that I've invented. Wouldn't have authority. Is your, it seems to me like, like implicitly your argument is sort of turning on Congress created this big agency and the big agency has the problems, but all those problems kind of stem from the head of the agency, not being removable. The other problem that we talked about in Gordon. And so as long as it's a really big agency, then somehow we don't have the standing problem because the agency, it kind of has a life of its own. Whereas if it's just judge Van Dyke out there violating the separation of powers, then that would, that would kill all the actions he took. I mean, is that, that, that seems to be the only distinction I can think of between those two things. But your honor, I, you know, I think there, there is a distinction there. What is it within the statute itself? If you look at 5564 a the, the Bureau, I'm sorry, B the Bureau has authority to act through its attorneys. And actually I think that the, the, the argument here, I think is a variation, or it may be the argument, the fruit of the poison tree argument that judge Akuta raised and that the majority in court actually rejected. So I, I would disagree with that, with that hypothetical and with, and with the consequences of it as it was found in Gordon. Can I ask you a couple, I want, I want to find out just for you to articulate whether you think we can decide this case while SILA is pending on remand from the Supreme Court, knowing that that has priority over us. What do you see as, how do you see as what SILA does affecting this? Well, it certainly addressed the ratification issue here, your honor. It also has, you know, also in SILA law, there is a statute of limitations argument. It's different in the CID, maybe it may be different in the CID context, depending on how SILA law addresses that question. But obviously there are other issues here that this court, there are multiple issues in this case that certainly this court could, could rule on, but it would depend. If you lose on the ratification issue in SILA, then do you automatically lose here? No, your honor, I don't think we do. This would be different as an enforcement action, as opposed to a CID, but it would depend on, your honor, it would be a different, it's a difficult question to answer simply because the rationale in SILA may be different from here. And it's difficult to predict what the effect of SILA might be. Let's talk about your restitution issue. So why would ordering nationwide to pay the entire amount of its gross revenue for a relevant period be a just result under the circumstances, given the absence of any finding of fraudulent conduct? Your honor, I would disagree with the premise of that question. There was deceptive conduct here. There was deceptive conduct that was found to apply to all consumers, namely the misrepresentations around interest savings. And under this court's, under the Commerce Planet test from Commerce Planet and from Gordon, it was the Bureau's burden to establish an appropriate amount of restitution by reasonably approximating nationwide unjust gains. And we did that by showing that revenue. So the answer is that we were following the burden shifting framework, your honor. Well, it sounds like though now you're arguing that it seems like in front of the district court, all the arguments were that it was equitable and it was a discretionary matter for the district court. And now you're arguing that its restitution is mandatory under the language of the statute? Your honor, there are two places in Nationwide's brief where it says that. The second one, your honor, is actually a misquote where Nationwide attributes to the Bureau a statement actually made by cash call defendants. It is not a concession that we said restitution is not mandatory. It's a bad site. I'd just like to flag that for the court. I'd be happy to follow up with details about that. The other one was simply a closing argument in which my colleague simply said, was describing the holding and figure around the value of the product and when restitution would be appropriate vis-a-vis the value of the product. It was not a concession about the kinds of remedies we were seeking here. So we did not concede that. I would also, your honor, if I may, Nationwide also said we conceded that we could not bring this action afresh. I'd just like to correct that. That is an artful quotation of our description of Nationwide's argument. We never conceded that. And I'd just like to note that for a record that it is a misreading of our brief to suggest we conceded that. So what you're saying, if this is dismissed, you can start over again? Is that what? Maybe I'm missing what you're saying here. What are you saying? Well, we're saying that we do not need to bring this action afresh. And that's established by Gordon. But Nationwide takes a quote from our description of Nationwide's argument and frames it as a concession. I just want to make clear that we did not concede that. I think it's an artful quotation by Nationwide and misrepresented our position. I just want to be clear that we did not concede that. Okay. If we find that Section 5565A2 confers discretion on the district court on the question of whether to award restitution, does it matter if the restitution that your agency seeks is properly characterized as legal or equitable? It does, Your Honor. I see I'm close to my time on rebuttal. I'll give you, you can have your time on rebuttal. So just answer our questions. It does, Your Honor. Under the Great West and Curtis cases that we noted, because we were seeking legal restitution, it would deprive the court of discretion to deny that restitution if we proved a violation of resulting harm. It comes straight from Great West and from Curtis. So it does make a difference. Now you're saying it's legal, right? It is legal restitution. But what did you argue in the district court? Your Honor, we did characterize it as legal or equitable, but with the kind of restitution that we were seeking was legal. And in fact, Your Honor, in Great West, the district court did not address that. That was not raised in the district court in that case either. It was raised in this court. The Great West was a Ninth Circuit case in which the distinction between and the relevance and consequence of the legal versus equitable was raised in the first instance in the Ninth Circuit and in the Supreme Court. Well, so is it your position that a district court must order a defendant to pay restitution in every case in which the court finds there to be any violation of CFPA? I mean, if so, is there any indication that Congress would have intended even minor violations of the statute to result in restitution awards equaling a company's entire gross revenue for a given period? Well, Your Honor, I think it would depend on the nature of the remedy sought. You know, 5565A2 gives a whole toolbox of remedies. And so any violation, there may be violations that don't require restitution. For instance, if we have authority over 18 different enumerated statutes. So I can very well imagine there are cases in which restitution is not appropriate. It's not an appropriate tool for the kinds of harm that might arise under a particular statute. So it's not mandatory in the sense that any violation of the CFPA necessarily results in restitution. But where the Bureau shows is seeking legal restitution, shows a violation and resulting harm, then restitution would be required. And Your Honor, that's entirely consistent. This court upheld that kind of logic in City of Hayward where it said. So what do you do with the money? I mean, a lot of the mandatory victim funds, there are some statutes that are clearly mandatory and on the restitution, they give them out to victims for, you know, like a child molest or this, that, or murder victims or this, that, and the other. What do you do with the money? Well, restitution, Your Honor, as I understand it, is typically awarded to the harm consumers. Discouragement typically goes to the Treasury, though I think there is more discretion around discouragement. I think it can be used for other purposes. But restitution is intended, as I understand it, many courts construe that as a remedy used to make consumers whole. I don't think that's a hard and fast distinction, but that is typically how restitution is handled. If I could ask a question on the liability. So the only finding that the district court made regarding liability for all its customers is the average savings statement. Is that correct? It was one that said was affected all or virtually all. Yes. Yes. So I guess how is that misleading or deceptive if they, you know, they qualified it by saying it's through the length of the loan. So it's 100% accurate, right? Your Honor, that wasn't the factual finding of the district court. The district court found that sort of disclaimer was not clear to consumers and that consumers would have understood average to mean average in terms of slight variations in calculations. But that when you tell someone, hey, I'll charge you $995 and on average in the first year or two, you'll say $1,500. Consumers would have understood that as meaning, wow, within one year I'll make back, you know, $500. That was the district court's factual finding there and why the court found that that was why that was deceptive. Yeah, but I mean, but if you understand a mortgage, you understand that the interest is over the life of the loan. And, you know, most in the record, most of the flyers had the total interest savings, like, you know, $19,000 and the next one was the average. So they would understand, why wouldn't the reasonable consumer understand that that big number, the interest savings over the life of the loan, the average is just that divided by the amount of time? Because your finding was that how nationwide marketed that claim about savings didn't make that calculation clear. And that's again, that's a factual finding by the district court about what consumers would have understood when they said, you're going to get, you know, this average amount of savings. What supported that factual finding? The one problem I have with the district court's ruling is it doesn't really cite to any evidence. I mean, barely does. And so I don't know how the district court came to that finding. What supports that finding? I think he's locked up here. I stumped him on that question. I just lost. I think you're frozen. I'm sorry, I just lost it. I was frozen for 10 or 15 seconds. Yeah, if I could recall my question, what was the factual basis for the district court's finding for that? I was saying one of the problems I had with the district court's opinion, it rarely cited to any evidence or exhibits. And so I don't know how the district court came up with that conclusion that a reasonable customer would be confused by that. Your Honor, it looked at the representations that Nationwide made about how it presented that average savings. But the basis of your question was, was it clear enough within the decision? And if it was incumbent on Nationwide to file a 52B motion to seek clarification, they did not do that. We're moving for clear error. So I don't know how we're supposed to know if there's clear error or not if we can't know what the basis of that finding was. Well, Your Honor, I think you would look at the mailings that Nationwide made, but certainly within the record. Was there any evidence of customers that were actually confused by it? Yes, Your Honor. We had, I think, four consumers within the first couple of days of the trial talking about the kind of confusion that they faced. On the average monthly savings issue? I believe, Your Honor, I would have to go back and check. I wouldn't want to say that for certain, but I'm fairly confident that they testified to that. It's certainly within the record. It seems to me like if that was actually, they were, you know, as misleading as the district court concluded it was, this is kind of a self-validating thing. Because if the whole point is they're saying a certain amount of savings and Nationwide saying people would understand that's over life alone and the court saying and CFPB saying no, you know, they're thinking that's going to be immediate savings. In the years, just within one year, you'd have tons and tons of customers saying, hey, I spent $900 and I didn't get my $1,500 savings. So it seems like it would be a sort of a self-validating thing and I don't think that there's that kind of evidence in the record, right? Like four people out of all of the people saying that they were generally confused is like being so misleading that people are that everybody's surprised. It turns out that they didn't save their $1,500 in their first year. Well, your Honor, I think that goes to a question about reliance. Did consumers actually rely on this and under a figgy, the fact that these are widely disseminated misrepresentations material misrepresentations that resulted in the purchase of a product. It also just goes to whether it's deceptive and I guess what you're saying is if you're saying it was only reliance, it would be that, yeah, they were all misled, but when it turned out that they didn't get their $1,500 in the first year, they were all like, oh, well, who cares? That doesn't, I don't know. That doesn't make sense. Well, certainly, your Honor, consumer complaints certainly aren't just positive one way or the other about whether or not there was a violation. In fact, one of our arguments here is that Nationwide was very good about kind of smoothing over these kinds of issues and making them not. Rumate's point, like, you know, there should have been some evidence. CFPB should have been able to go out and get people, reams of people that would say, yeah, I totally rely on the fact that I was going to like save all this money up front. It just, it doesn't seem very intuitive to us who probably all have mortgages that people would think that the savings would be all up front and not over the life of the loan. And so you take that and that thing that doesn't seem very intuitive. And the added that you didn't have, it doesn't seem to me you have a whole bunch of people complaining about that issue. So that does seem to be a something that does not seem to be supported by substantial evidence, nor intuitive to me. Your Honor, to have, we have four, we have a limited amount of time at trial. I should note that we put on four witnesses over, I think it was the course of two days. You know, certainly we were not presenting, we put on substantial evidence, but that's actually not the issue here, your Honor. The government doesn't have to show that each and every customer relied on this. What it has to show is that there was a deceptive practice. It does not have to show any particular consumer, or that a whole host of consumers relied on that, because reliance in the context of a government enforcement action is presumed, whereas I mentioned there's a widely disseminated misrepresentation that results in the purchase of a product. No, but I'm not, again, you're going to reliance. I'm just, it just seems to me, it's not clear to me that that's susceptible to see. I understand that was your theory, and I understand the district court judge bought it, but it just seems to me like it doesn't seem to me to, I mean, remember the standard, I think, is that whether an average reasonable person would be deceived by that, and I'm having trouble seeing how that. Well, in this situation, because it's not a jury, you know, if you had 12 people being, thinking like that was deceptive, it might be different than, even though technically when you sit as a trial judge, you're, you know, that trial judge thought, well, I don't like this, but so that's the, I don't know if that somehow takes away from it. I guess, what's your best argument of, in the record, what would show that a reasonable customer would be deceived? Your Honor, I would look to, in the record, I would look to the testimony by consumers. I would look to Nationwide's representations in its marketing materials, and how that representation was made in terms of, for things, Nationwide said something like, they frequently said, immediate sales. Um, it's, it's a whole host of representations over millions of mailers. Um, so it was, it was a widespread. What's wrong with immediate? I mean, if, if they're paying extra, if a consumer is paying extra equity, that savings is immediate. Well, Your Honor, it's not immediate if you're paying a $995 setup fee, you don't say. But the district court said the setup fee was adequately disclosed, so I don't understand that argument. Ah, but you don't save anything until you've saved enough to pay off the setup fee. That was one of the district court's findings. The reason, the one reason that the interest representation was, was, uh, uh, was missed, was deceptive, was that they didn't account for the setup fee. On my screen, you kind of broke up, so I didn't hear what you said. I see, so you have to have enough savings to offset the, uh, the setup fee before the savings is, becomes, uh, that makes sense, okay. And, and it would take nine years, Your Honor, to, for that to happen. It was not immediate. You would have to be with Nationwide for, on an average of nine years before you would see a dollar of savings. And so that claim of, that, that promise of immediate savings, uh, was not, it was not realized by consumers. Okay, well, we've taken you over, but I will give you a lot over. But I'll give you four minutes for, I'll give each of you four minutes for rebuttal. But, uh, so Mr. Stawell, your rebuttal is both to his restitution argument, that cross appeal and, and any rebuttal you want to say about your case. And, but Mr. McRae-Worrell, your rebuttal has to do with the restitution. Okay, all right, go ahead. Thank you, Your Honor. I'll start right where we left off and I'll answer the question that Judge Bumate posed. The four consumers who testified, testified almost exclusively about the setup fee, a little bit about the affiliation with the lender, and not at all about what we were just discussing, the, the savings. The savings I'd like to make, the fundamental point is, I think, we're all basing this on our intuition. My intuition is the same as Judge Bumate's. It's not misrepresentation at all to say, I just paid off money toward my principal. I got immediate savings on that, even though, you know what? I plan to leave my home quicker than the 30-year mortgage I'm in. That's not, that's not a misrepresentation. But the problem is, it's just based on intuition. That is why we think either that the word deceptive must be tied to actual consumer evidence as a matter of statutory interpretation or as a matter of constitutional vagueness. Moving on to the rest, and that argument is fully briefed, of course. So with three minutes left, I want to move on to restitution. The restitution point is the government thinks that so long as it establishes any violation, it can get the full amount of revenue. That is a theory that is so incredibly too broad that it fails. That the, at the district court level, the government said that they're, they do not need to prove a nexus at all between the violation established and the amount of restitution they seek. But that is belied by this court's cases, indeed by the government's cases themselves. They, the restitution needs to quote, reasonably approximate the unjust gains. There were, the restitution offered the all or nothing amount did not reasonably approximate the unjust gains. They did not come close. Let me ask you this. I think that there's an argument about waiver in terms of how they presented this below and how they presented it here. But is, are they making this claim that that's the restitution that's mandatory? Are they making it in other cases? Is this their general principle on that? Is there, there is a case called cast call is before this court. It's being held actually for seal, seal law, the panel decision. They're making the exact same argument in that case. In that case, they more clearly than in this case argued the opposite below. In this case that they didn't really argue one way or the other. They said some things that made the judge think it was equitable and, and, and made it think that it was up to his discretion. But in this, in, in cash call, they are arguing the same thing before this court. But on the idea of legal versus equitable relief, our principle submission is precedence over us. That case has been argued already on this restitution issue. I, the oral argument, it was probably six months ago. But that, that, the panel held it in abeyance for seal, seal law panel. And there are other issues there. And, and, you know, but on the point about legal versus, or rather mandatory versus discretionary, that same argument is presented. We don't think that legal versus equitable, that distinction matters. If it does matter though, I would ask the court to look to the recent Supreme Court decision in lieu, which shows that this is in fact equitable. And, and, and, and the government is wrong that it's legal, but that distinction doesn't matter. And mandatory or discretionary, the government did not, it failed in its burden to reasonably approximate the unjust gains. If with the court's permission, I have a few points to tick off on the most, most fundamental issue in this case. You have 28 seconds in less. Okay. Your honor, I'll get right to it. The, the, I guess if I had a, a, a principal submission, it's that judge Van Dyke's a hypothetical is this case. Although it's more glaring in that case, the government is trying to resist seal law by saying that this isn't a fundamental separation of powers violation. I guarantee you that the majority of the Supreme Court did think it was a fundamental. And therefore this court needs to, if seal law comes out, contrary to our side, we would ask either that this court note in its, in its opinion, that this case is worthy of Supreme court review or that this court take the case on Bach. Thank you. All right. Mr. McRae world, you have four minutes. Your honor. I'd like to respond to my colleague's argument that the full amount of restitution was somehow inappropriate. That's precisely what was ordered in city. And there was no, this, this nexus nexus principle is out of whole cloth. In Figge, there was no nexus between a deception around the setup fee and the amount that was ordered in restitution. There doesn't need to be. In Figge was a case about deceptions around fire detectors, not about the purchase price. Same thing in Pantron where restitution full amount of the purchase. Do we have another ninth circuit case? That's going to speak to this issue and have precedence over us. On the question of the nexus. Well, just on restitution for the, just on the restitution issue. Well, it does, it does come up in cash call your honor. The restitution issue is raised in cash call, but you're under this, this notion that there's all like cash CASH. Yeah. CASH, C-A-L-L. Yes, your honor. And your honor, I wanted to go back to your question about the, you know, the interest savings that I would simply direct the court to extracts of record page 13, the court's discussion here. It was based on the expert testimony here, as well as on the mailers in the trial exhibit. So this was not something that court sort of just sort of, you know, invented and it certainly was based on a review of the record. And the court is obviously is certainly entitled to deference on its factual findings. It was able to evaluate the demeanor of witnesses. It was able to look at these, these exhibits in the context of the trial. You're not really supposed to get the last say on his case. You get the last say on your case. Well, your honor, but your honor, actually that goes to the question of restitution, because it goes to restitution and make me feel better. Okay. Thank you, your honor. But it goes directly to the question. It's, it answers the question around restitution because it goes to the amount that would be the calculation of the amount of restitution. But I just would, I would like to address this. Can I ask that question then? How is that tied? The restitution is tied to the setup fees. How does that misrepresentation or deception relate to the $73 million in setup fees? Well, your honor, that goes to that, that's explained in Figge. The fraud is not in the product. It's not in what was sold. The fraud was in the selling itself. So if there's, if, if I, if I sell you as in Figge, if I sell you a rhinestone and tell you that it's a diamond and I charge you $100, it's only worth $10. You know, the fraud is in the selling, not it, not around the purchase price. It's because of what you were expecting. And the court district gets into this. And it, the, the, the misrepresentations here infected the decision, infected the decision to buy the product. That's why it's on your theory. Could, could the CFPB go after mortgage companies generally for offering you to buy down your, to buy down your mortgage with points? Because it seems to me like that's just kind of the similar, very similar. Cause you buy down your mortgage with points and it gets you a lower interest rate, which you get the benefit of if you keep your house for 30 years, right? But very few people keep their house for 30 years. So you pay this upfront money to, to save something over the years. Cause CFPB come in and say, well, that's deceptive. The way you're advertising that, that points will save you money because it'll only save you. I mean, there's no question here. These people, people would have saved money over the life of the loan, but most people don't keep their loan for the entire 30 years. And so that's the, that's the whole crux of the deceptiveness here, I think. And if that's the case, then it doesn't, that make offering points deceptive. Your honor, it's not the structure of the product. It's not the fact that, you know, how savings are, are, are accomplished here. They might be as accomplished through points. It's the misrepresentations around them. So for instance, your honor, if someone said, you know, if you buy down your mortgage with, you know, with, with, with points, you're going to see, you know, this amount of savings over a particular amount of time. And that, that was a misrepresentation. Then yes, there may be a violation there. But that's the issue. It's not the structure of the product per se. It's, you would say if they were selling points and they were saying, you'll see immediate savings or something. And I, I'm, I'm following that. So I think points, you could be treated similarly, but all depend upon how, what, what was said about it. It would certainly depend on the representations, your honor. Yes. All right. Go ahead. Sorry. One last one. As long as you have questions. Yeah. Real quick. So on the figgy question on the diamonds, so say that they sold the diamond that was supposed to be worth $90, but the diamond was flawed and it was only worth $80. Are you saying for restitution purposes, you could still charge, you could still claw back the $90, even though the customer got an $80 value? Your honor. Well, the restitution would be the purchase price. Yeah. I mean, you would get, I mean, that's, that's actually, that is, that is figgy, your honor. Because there was a huge difference, right? I mean, that, in that case, rhinestones were $10 or you're saying, and the diamonds are 90. Well, I'm just saying, what if, because the customer here received the value they were asking for, they might've been induced in a, in a deceptive way, but they received value for their product. Right. Your honor, figgy makes clear that the value of the product doesn't make a difference as far as it being a deceptive claim or in remedy. Figgy says that, and these were, you know, just because you got a fire detector that might've saved your life in a heavy fire, doesn't mean you didn't get the full purchase price back. Because figgy said, made misrepresentations about his relative safety and these smoke detectors, you know, you might die of a smoke inhalation before your fire detector saves you. That doesn't mean the fire detector was valueless, but what it does mean is that you do get restitution for the full purchase price because you were, the fraud was in the selling. All right. Do either of my colleagues have any additional questions? Thank you, counsel. All right. Thank you both for your arguments. Very helpful. And this matter will stand submitted and this court will be in recess until tomorrow morning at nine o'clock. Thank you.
judges: Callahan, Bumatay, Vandyke